Leston BANCROFT, Peachlie Bancroft and Elizabeth Bancroft, by her Father and Natural Guardian, Leston Bancroft, Plaintiffs,

v.

CITY OF MOUNT VERNON, Mount Vernon Police Department, MVPD Officers "John/Jane Does" 1–10, Mount Vernon Civilian Employees "John/Jane Does" 1–10, and Confidential Informants "John/Jane Does" 1–10, Defendants.

No. 08 Civ. 9677(CM).

United States District Court, S.D. New York.

Nov. 23, 2009.

Michael S. Duffy, Scarcella Law Offices, White Plains, NY, for Plaintiffs.

Nichelle Aniece Johnson, City of Mount Vernon, Dept. of Law, Mount Vernon, NY, for Defendants.

## DECISION AND ORDER DISMISSING THE COMPLAINT

McMAHON, District Judge.

Sometimes bad things happen to good people. This lawsuit arises out of one such instance.

Plaintiffs are a husband, wife and their four-year-old daughter. They are law-abiding citizens of the City of Mount Vernon. Through no fault of their own, they were subjected to a frightening encounter with armed and helmeted officers of the Mount Vernon Police Department, who burst into their home at 6 AM on July 13, 2007, handcuffed them, and searched their apartment. The officers were armed with a warrant, signed by a neutral magistrate, bearing the address 70 South Third Avenue, Apartment 4, which is plaintiffs' address. The problem, of course, is that it was the wrong address: the apartment the officers should have searched was the apartment next door. The warrant bore the wrong apartment number, apparently because a confidential informant gave the police the wrong apartment number.

Plaintiffs are understandably angry and upset. They have sued the City of Mount Vernon[1] and certain unidentified police officers and "civilian employees"—as well as unidentified "confidential informants"—alleging a violation of their right to be free from unreasonable searches and seizures, and use of excessive amounts of force, all as guaranteed by the Fourth Amendment to the United States Constitution.[2]

If we lived in a perfect world, these sorts of mistakes would never be made—the court wishes they were never made, and I rather imagine the defendants do as well. However, sometimes mistakes ARE made, and nothing alleged by plaintiffs, in

1. They also sue the Mount Vernon Police Department, but since the proper defendant in an action against a municipal agency is the municipality, not the agency, the proper party defendant is the City of Mount Vernon, not the Police Department

2. Plaintiffs' complaint mentions the First, Fourth, Fifth, Eighth and Fourteenth Amendment. The facts alleged in their complaint allege principally a violation of the Fourth Amendment (unreasonable search and seizure, false arrest and imprisonment and use of excessive force) as made applicable to the states by the Fourteenth Amendment. Plaintiff Peachlie Bancroft also asserts a Fourteenth Amendment claim for violation of the right to privacy. No other constitutional claims can be made out on the facts alleged.

their complaint or in the testimony given at their Rule 50–h hearing, suggests that they have any basis in fact for alleging that anything other than a mistake caused their apartment—rather than the apartment next door—to be wrongly specified in the warrant application and the warrant. Nor do they allege any facts that would give rise to any inference that the warrant was issued without probable cause, or that the officers violated the law by carrying out the search authorized by the warrant. Accordingly, plaintiffs' federal claims are dismissed. Because plaintiffs' state law claims are barred by governmental immunity, they are dismissed as well.

### Statement of Facts

### A Warrant Specifying the Wrong Address Issues

On July 12, 2007, Mount Vernon Police Officer Edward McCue presented an application for a search warrant to a judge of the Mount Vernon City Court.[3]

Officer McCue's affidavit related that he was assigned to the Intelligence Unit of the Mount Vernon Police Department, and had participated in approximately 100 intelligence debriefings. On July 12, 2007, he spoke with a confidential informant who had given reliable information in the past to Detective Chris Hutchins of the MVPD and Officer Ronald Faivre of the Yonkers Police Department. The information the CI gave on these prior occasions led to the seizure of one handgun and a quantity of heroin, and to the identification of suspects who were being investigated at the time of the affidavit.

In the July 12 debriefing, the CI stated that, on July 5, 2007, he was inside apartment # 4 at 70 South 3rd Avenue, where he observed one Duran Reeves in possession of a silver .45 caliber semiautomatic handgun with a black handgrip. The gun was observed in the waistband of Reeves' pants. The CI further stated that on July 9, 2007, he observed Reeves in a house on South 12th Avenue in Mount Vernon, in possession of the same handgun, and in an intoxicated state. The CI told McCue that Reeves "has been staying at 70 S. 3rd Ave, Apartment # 4 with Antonio aka "Tone" for approximately two months"; the CI claimed to have visited Reeves at that location on three occasions. McCue further averred that Detective Parker of the Westchester County Police, Pistol Permit Unit, had ascertained that Reeves did not have a pistol permit.

McCue further averred that members of the MVPD had "confirmed the description of the above-location as set forth herein" earlier that day (July 12, 2007). McCue reviewed arrest records and found "at least two prior arrests for marijuana possession" by Reeves.

McCue sought a warrant to search the premises at 70 S. 3rd Avenue, Apartment # 4, Mount Vernon, New York for firearms and associated paraphernalia, as well as for documents connecting Duran Reeves to the premises being searched. Citing his experience as a narcotics investigator, which had taught him that handguns were often kept in areas where they could be easily seized, McCue sought per-

---

**3.** The court may take notice of the contents of the warrant and its supporting application because plaintiffs refer to those documents in his complaint and rely on them in bringing his lawsuit. *Rothman v. Gregor,* 220 F.3d 81, 88–89 (2d Cir.2000); *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 808 (2d Cir.1996). The court is not required to accept plaintiffs' characterization of the text of those document, even on a motion for judgment on the pleadings, which is adjudicated as though it were a motion to dismiss for failure to state a claim. The relevant documents are Exhibits B and C to the Mount Vernon Defendants' Notice of Motion.

mission to execute the warrant without first announcing who the police were and what their purpose was (a so-called "no knock" warrant). And because firearms could be located in a locked drawer of a desk or bureau, he sought permission to look inside locked drawers or boxes.

At 4:56 PM on July 12, 2007, a judge of the Mount Vernon City Court signed a no-knock warrant authorizing the search of "apartment 4 at 70 South 3rd Avenue" in that city. The warrant was valid for ten days from the date of issuance; it was sealed except for copies provided to the Westchester DA, the MVPD and DA Investigator # 06–NA 102.

Antonio, it turns out, lived in the apartment next door to Apartment 4 at 70 South 3rd Avenue in Mount Vernon. Reeves had been staying with Antonio in that apartment, not in Apartment 4.

### The Warrant is Executed

Armed with the warrant, MVPD officers arrived at the denominated apartment early the following morning. They went to the apartment indicated on the warrant— that is to say, they did not go to the "wrong" apartment in the sense that the apartment searched was not the one actually listed on the face of the warrant. The warrant specified Apartment 4 and the police went to Apartment 4. And in accordance with the permission granted by a neutral magistrate, they crashed through the door and into the lives of the Bancroft family.

Apartment 4 at 70 South Third Avenue in Mount Vernon turns out to be the residence of one Leston Bancroft, age 59, together with his wife, Peachlie, and their daughter, Elizabeth. In the complaint in this action, the Bancrofts described what happened that morning:

[O]n or about July 13, 2007, at approximately 6:00 a.m., members of the Mount Vernon police department, acting under color of law, forcibly restrained and handcuffed claimant LESTON BANCROFT, a fifty-nine-year old man, in his own home, in front of his wife and young daughter, and pushed and shoved and bullied him around in his own apartment, knocking him to the floor and causing him to striking [sic] his mouth and face and head on the bathtub, all the time while handcuffed.

[O]n or about July 13, 2007 . . . .members of the Mount Vernon Police department, acting under color of law, forcibly restrained and handcuffed Plaintiff PEACHLIE BANCROFT.

[O]n or about July 13, 2007 . . . members of the Mount Vernon Police department, most of whom were male, acting under color of law, restrained and handcuffed Plaintiff PEACHLIE BANCROFT, an adult married female, and refused to allow the [sic] to cover her exposed bosom and person, having been in a state of partial undress when the aforesaid defendants, many of whom were male, forcibly entered in to the confines of her private home.

All of this was apparently witnessed by the child, Elizabeth.

Pleadings rarely give a sense of the full drama of these incidents. Mr. Bancroft testified at hearings held pursuant to Gen. Mun. L. Sec. 50(h) prior to the filing of this lawsuit. He described what was, from their perspective, a harrowing scene:

Leston Bancroft was sitting on a bed in the living room of his apartment when he heard the sound of a bang "like a gunshot." Suddenly he was surrounded by four policemen, who pointed a gun at him and said, "Don't move," and "Put your hands up." The police officers spun Mr. Bancroft around and handcuffed him. When he asked why they were there, the officers said, "We are here to search your

place." When Mr. Bancroft protested that the officers had the wrong place, a "rough" police officer put his hands behind him, ordered him to get off the bed and pushed him into the bathroom, where he slipped on some water that was on the floor, fell and hit his face. After they returned to the living room, Mr. Bancroft was confronted by the sight of his wife being escorted out of the bedroom by two police officers, with her hands cuffed behind her. Their daughter was crying. (Transcript of Leston Bancroft's 50–h Testimony, Exhibit D to Plaintiffs' Memorandum of Law in Opposition to Defendants' Rule 12(c)/56 Motion ("Leston 50–h Testimony") at 12–14.)

Mrs. Bancroft had awakened when she heard a loud crash or bang that came from the vicinity of their front door. Four male police officers rushed into her bedroom, pointed their guns at her and her four year old daughter, who was sleeping with her. The police were dressed in black, wearing helmets, masks, black boots, bullet proof vests and attire "that looked to me like they were preparing to fight a war." Mrs. Bancroft was naked, and when she sat up the officers could see her breasts. The police told her not to move, so she tried to cover herself up using the sheet, and then asked the officers for help to get her some clothes. One said, "We don't want to see your body," and they told her to "shut up." Another told her to, "Shut that brat up," referring to the crying child. Mrs. Bancroft's breasts remained exposed for three or four minutes, at which time she was allowed to dress. She was then handcuffed and taken to the living room. There she saw that the frame of their front door had been destroyed; the wood around it was shattered. She also saw smoke and smelled a smell that was "like fireworks;" she realized that the police had battered down her door to gain entry to the apartment and set off some sort of "grenade." She saw her husband fall when he was pushed into the bathroom; he hit his head on the rim of the bathtub. (Peachlie Bancroft's Affidavit ("Peachlie Aff.") ¶¶ 2–8.)

Having incapacitated the adult inhabitants of the apartment, the officers carried out their search. They found nothing. One of them said, "Seems like we have the wrong place, there is nothing here." Another officer asked for identification. Mr. Bancroft gave their names and provided identification. The officers conferred; Mr. Bancroft heard one of them say, "This is not the people. None of the names were on the warrant." (Leston 50–h Testimony at 17.)

The police took off the handcuffs and left the premises. The officers did not apologize for their mistake. (Peachlie Aff. ¶ 12.)

Mr. Bancroft went to the emergency room, where he was treated for injuries to his face and leg that resulted from the fall in the bathroom. He was at the hospital for about two and one half hours. (Leston 50–h Testimony at 24, 27.)

### The Complaint; The Motion; The Procedural Posture of the Case

After serving a notice of claim on the City of Mount Vernon in accordance with New York's General Municipal Law § 50–e, the Bancrofts brought this action in the Westchester County Supreme Court. The complaint, which was later removed to this court, asserts thirty-eight causes of action.

Each of the three plaintiffs (Leston, Peachlie and daughter Elizabeth) asserts state law claims in negligence (First through Third Causes of Action), Assault (Fourth through Sixth Causes of Action), Battery (Seventh through Ninth Causes of Action), Negligent Entrustment (Tenth

through Twelfth Causes of Action), False Arrest/Imprisonment (Thirteenth through Fifteenth Causes of Action), for violation of various rights secured under the United States Constitution (Sixteenth through Eighteenth Causes of Action); Unreasonable Search and Seizure in violation of the Fourth Amendment (Nineteenth through Twenty–First Causes of Action); Excessive Force (Twenty–Second through Twenty–Fourth Causes of Action); Failure to Intervene to Protect Civil Rights (Twenty–Fifth through Twenty–Seventh Causes of Action); and corresponding claims under the New York State Constitution (Twenty–Eighth through Thirty–Third Causes of Action). Plaintiffs also asserted separate claims for punitive damages (Thirty–Fourth through Thirty–Sixth Causes of Action). Leston and Peachlie also brought claims for loss of consortium (Thirty–Seventh and Thirty–Eighth Causes of Action).

Defendant City of Mount Vernon is the only defendant who is identified in the caption; everyone else is a "John Doe" defendant. Mount Vernon, having been served, has answered the complaint and moved for judgment on the pleadings under Fed.R.Civ.P. 12(c). It has also moved for summary judgment on behalf of its "John Doe" police officers and civilian employees on the ground of qualified immunity, although none of those officers has been identified or served. In support of the latter motion, they attach to their motion papers the testimony given by Leston Bancroft at his 50–h hearing; this comports with the court's rules, which require that a plaintiff whose claim is subject to a defense of qualified immunity be deposed prior to the consideration of that motion.

Plaintiffs oppose the motion with affidavits from both Leston and Peachlie Bancroft, which supplement Leston's 50–h testimony. From the opposition brief, it is clear that this testimony is presented in opposition to the Rule 12(c) motion as well as the qualified immunity motion.

*Discussion*

## Standard for Deciding a Motion for Judgment on the Pleadings

■ A motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c) is decided following the procedural rules applicable to a motion to dismiss pursuant to Rule 12(b)(6): that is, the Court must liberally construe all claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Cargo Partner AG v. Albatrans, Inc.,* 352 F.3d 41, 44 (2d Cir. 2003); *see also Roth v. Jennings,* 489 F.3d 499, 510 (2d Cir.2007). However, to survive a motion to dismiss, "a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (*quoting Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (*citing Twombly,* 550 U.S. at 556, 127 S.Ct. 1955). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955 (internal quotations, citations, and alterations omitted). Thus, unless a plaintiff's well-pleaded allegations have "nudged [its] claims across the line from conceivable to plausible, [the plaintiff's] complaint must be dismissed." *Id.* at 570, 127 S.Ct. 1955; *Iqbal,* 129 S.Ct. at 1950–51.

## Standard for Deciding A Motion for Summary Judgment

Since the court is not going to strike the affidavits of the Bancrofts, if I consider the contents of those affidavits otherwise than in connection with the motion for qualified immunity, I must treat the motion for judgment on the pleadings as a motion for summary judgment. Fed.R.Civ.P. 12(d). Ordinarily I would have to provide defendant with an opportunity to supplement the record before converting the motion addressed to the pleadings into a motion for summary judgment. *Hernandez v. Coffey*, 582 F.3d 303, 307 (2d Cir.2009); *see also In re G & A Books, Inc.*, 770 F.2d 288, 295 (2d Cir.1985). However, since I am going to grant summary judgment to defendants, it will not be necessary for them to supplement the record.

A party is entitled to summary judgment when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In addressing a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in [its] favor." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Whether any disputed issue of fact exists is for the Court to determine. *Balderman v. United States Veterans Admin.*, 870 F.2d 57, 60 (2d Cir.1989). The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the non-moving party must present "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Finally, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, 106 S.Ct. 1348. To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant.

## Standard for Deciding a Motion for Qualified Immunity

A motion for summary judgment on the ground of qualified immunity has its own set of rules to consider.

■ Government officials performing discretionary functions are entitled to qualified immunity "from federal constitutional claims ... as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

■ The doctrine of qualified immunity is generally understood to only protect government officials from federal, not state, causes of action. *Jenkins v. City of New York*, 478 F.3d 76, 86 (2d Cir.2007). However, New York common law fills this gap by providing government officials with a similar form of protection against state law claims. *Id.; see Jones v. Parmley*, 465 F.3d 46, 63 (2d Cir.2006) ("New York law

... grant[s] government officials qualified immunity on state-law claims except where the officials' actions are undertaken in bad faith or without a reasonable basis.") (*citing Blouin ex rel. Estate of Pouliot v. Spitzer*, 356 F.3d 348, 364 (2d Cir.2004), and *Arteaga v. State*, 72 N.Y.2d 212, 216–17, 532 N.Y.S.2d 57, 527 N.E.2d 1194 (1988)). "To be entitled to qualified immunity, it must be established that it was objectively reasonable for the police officers involved to believe that their conduct was appropriate under the circumstances, or that officers of reasonable competence could disagree as to whether their conduct was proper." *Allen v. City of New York*, 03 Civ. 2829, 2007 WL 24796, at *24 (S.D.N.Y. Jan. 3, 2007) (*quoting Brown v. State*, 12 Misc.3d 633, 648, 814 N.Y.S.2d 492 (N.Y.Ct.Cl.2006)) (*other internal citations and quotations omitted*). Thus, as is true of federal law, an officer's entitlement to qualified immunity under New York law depends on the reasonableness of his actions. *Jones*, 465 F.3d at 64 (*citing cases*). The only difference between the federal and state doctrines is that the reasonableness of an officer's action is judged with references to state law and the state, not the federal, constitution. *Allen*, 2007 WL 24796, at *24 (*citing Doyle v. Rondout Valley Cent. Sch. Dist.*, 3 A.D.3d 669, 670–71, 770 N.Y.S.2d 480 (3d Dept.2004)).

### The Complaint Is Dismissed

*(1) Plaintiffs' Unreasonable Search Claims Under Both Federal and State Law Are Dismissed (Nineteenth, Twentieth, Twenty–First, Thirty–First, Thirty–Second and Thirty–Third Causes of Action)*

■ Plaintiffs have brought claims under federal and state law alleging that the search of their apartment was unconstitutional, unlawful and unreasonable. Whether one views this as a motion addressed to the pleadings or a motion for summary judgment, these claims must be and are dismissed.

■ Under both the Federal and New York State Constitutions, all persons have a right to be free from arrest, search and seizure except on probable cause or pursuant to warrant. It is undisputed that the police obtained a search warrant and carried out the search in accordance with the literal terms of that warrant. The warrant contained the wrong address, but the police entered and searched the premises specified in the warrant. While the incident is regrettable, the search was not constitutionally unreasonable under either the state or federal constitutions.[4]

■ Plaintiffs assert in their papers opposing the City Defendants' motions that there are or may be issues with the propriety of the warrant application; in their affidavits, both Leston and Peachlie Bancroft speculate that the police may have acted with malicious intent and without probable cause. But a plaintiff who argues that a warrant was issued on less than probable cause faces a heavy burden. As my colleague, the late Judge William Conner, held in *Lynch v. City of Mount Vernon*, 567 F.Supp.2d 459 (S.D.N.Y.2008), a magistrate's determination that probable cause exists to support the issuance of a warrant is entitled to great deference from a reviewing court. *United States v. Leon*, 468 U.S. 897, 914, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Any doubt about the existence of probable cause must be resolved in favor of upholding the warrant.

**4.** The standard for what constitutes a constitutionally reasonable search is the same under federal and New York State law. *Johns v. Home Depot U.S.A., Inc.*, 221 F.R.D. 400, 408 n. 3 (S.D.N.Y.2004); *Nocera v. New York City Fire Comm'r*, 921 F.Supp. 192, 196 n. 1 (S.D.N.Y.1996).

*United States v. Salameh,* 152 F.3d 88, 113 (2d Cir.1998). Therefore, when a magistrate has found that an affidavit presented in support of a warrant application makes out probable cause, the person challenging the propriety of the warrant must make a "substantial preliminary showing" that the affiant (in this case, Officer McCue) knowingly and intentionally, or with reckless disregard to the truth, made a false statement in his affidavit, and that the false statement was necessary to the finding of probable cause. *Rivera v. United States,* 928 F.2d 592, 602 (2d Cir.1991).

 Here, as in *Lynch,* plaintiffs challenge the search warrant on the ground that the information allegedly giving rise to probable cause was obtained from a single confidential informant, who claimed to have been to the premises a grand total of three times. That is of no moment. Members of the MVPD's Intelligence Unit determined that the CI was credible; his information had led to the recovery of contraband in the past. That is sufficient to allow the magistrate to conclude that the informant is generally credible. Reliance on information from a single confidential informant whom the police and the magistrate deem credible is enough to support a finding of probable cause. *Speights v. City of New York,* 2001 WL 797982, at *4 (E.D.N.Y. June 18, 2001). There is no allegation, let alone any evidence, that Officer McCue knew that the CI was lying, or that he acted with reckless disregard for whether the CI was lying, when he swore out his affidavit; the affidavit reveals that he had information from brother police officers that the CI had proven reliable in the past.

 Plaintiffs also complain that the police did not conduct any independent investigation (other than talking with the informant and with police officers who had dealt with the informant in the past) before presenting the warrant application.

However, there is no constitutional requirement that they do so, and the warrant is not infirm if the police choose to rely on an informant in lieu of an investigation. *Lynch,* 567 F.Supp.2d at 466. This is especially so where the crime suspected involves firearms.

The complaint does not allege that Officer McCue either lied or recklessly disregarded the truth in his warrant affidavit; and the affidavits submitted by plaintiffs in opposition to the motion make it clear that plaintiffs have no basis whatsoever to make any such allegation. Plaintiffs' affidavits are replete with speculation and innuendo concerning the bona fides of the MVPD generally and McCue specifically. For example, Leston Bancroft says, "In my opinion, this seems very fishy. I do not believe that the police officer was being honest when he swore to the City Court judge that he confirmed the secret witness's description of the location.... I am informed that the police, through the use of their records were able to verify that the person they were looking for, Duran Reeves, had been arrested twice before. I am therefore surprised that they weren't able to verify where Antonio lived in the building, since it was my understanding that he too had many brushes with the law; at least enough that his name and address should have been on record with the police." (Leston Bancroft's Affidavit ("Leston Aff.") ¶¶ 7–8.) Mr. Bancroft concludes as follows: "Was the mistake really just a pretext to get into my home? Maybe, it was just a mistake, or maybe the police wanted to "go fishing" and their "mistake" was just a device. I believe the Court should allow my case to proceed *so that we can find out the truth.*" (*Id.* ¶¶ 9–10) (emphasis added.)

 Plaintiffs want to use a civil action to "find out the truth"—that is, to test whether they actually have a claim for which relief could be granted. But no less

an authority than the United States Supreme Court has made it abundantly clear that plaintiffs are not allowed to file complaints to "find out the truth;" rather, they have to have some basis in fact for alleging that the "truth" is what they believe it to be. *See Iqbal,* 129 S.Ct. at 1950 ("Rule 8 ... does not open the doors of discovery for a plaintiff armed with nothing more than conclusions."). Plaintiffs suffered the indignity of a search, with all of the police action attendant on the execution of a no-knock search warrant. But the facts alleged in their complaint, their testimony and even their affidavits admit of only one inference: the Bancrofts were the victims of an error. The facts alleged do not suggest anything more.

█ Therefore, plaintiffs' Nineteenth through Twenty–First and Thirty–First—through Thirty–Third Causes of Action must be dismissed insofar as they allege unreasonable search in violation of plaintiffs' constitutional rights, whether brought under the Federal or New York State Constitutions. The claims are dismissed as against all the Mount Vernon defendants, which is all defendants except the Confidential Informant.[5]

*(2) Plaintiffs' Unreasonable Seizure Claims (Nineteenth, Twentieth, Twenty–First, Thirty–First, Thirty–Second and Thirty–Fourth Causes of Action) Are Dismissed*

█ In the same six causes of action, plaintiffs allege that the police actions con-

fining them during the search violated their right to be free from false arrest and/or imprisonment, in violation of the Fourth Amendment to the United States Constitution and Article One, Section Twelve of the New York State Constitution. Again, they are wrong.

█ Police executing a search warrant are privileged to detain individuals, even to the point of handcuffing them, while the search is carried out. As the United States Supreme Court said in *Muehler v. Mena,* 544 U.S. 93, 98, 125 S.Ct. 1465, 161 L.Ed.2d 299 (2005), "An officer's authority to detain incident to a search is categorical; it does not depend on the quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure." *(internal citations omitted ).* The Court went on to observe, "The governmental interests in not only detaining, but using handcuffs, are at their maximum when, as here, a warrant authorizes a search for weapons ..." *Id.* at 100, 125 S.Ct. 1465. The need to detain more than one individual "made the use of handcuffs all the more reasonable." *Id.* In *Muehler,* detention of the sort experienced by Mr. and Mrs. Bancroft was not unreasonable when it lasted for the duration of a search—in that case, some two to three hours.

The categorical nature of the officer's authority to detain during a search execut-

---

**5.** There is another basis for the dismissal of the unreasonable search claims against the absent and (as far as the court knows) unserved, but nonetheless moving, "John Doe" police officer defendants. Because a neutral magistrate issued a warrant authorizing a no-knock search of Apartment 4 at 70 South 3rd Avenue, it was objectively reasonable for the officers who executed that warrant to do so—even if the magistrate ought not to have issued the warrant in the first place. It certain-

ly cannot be said that no reasonable police officer would have thought the warrant valid and proceeded to execute it on that assumption. Therefore, any officer defendants who might be served would be entitled to summary judgment dismissing the unreasonable search claims on the ground of qualified immunity. *United States v. Tisdale,* 195 F.3d 70, 72–73 (2d Cir.1999), *Lennon v. Miller,* 66 F.3d 416, 424–425 (2d Cir.1995).

ed pursuant to a facially valid warrant means that no unconstitutional false arrest or imprisonment occurred in this case. Furthermore, every exigent factor mentioned by the Supreme Court in *Muehler* was present in this case. The search was directed to weapons and to an individual known to possess weapons; more than one adult needed to be detained; and according to Mr. Bancroft, he and his wife were handcuffed only while the search was carried out, a period of approximately one hour. (Leston 50–h Testimony at 23.)

Thus, the unreasonable seizure portion of the Nineteenth through Twenty–First and Thirty–First—through Thirty–Third Causes of Action must also be dismissed, whether the motion is treated as one for judgment on the pleadings (in which case Mr. Bancroft's testimony is not considered) or for summary judgment (in which case it is).

Those six claims for relief are dismissed in their entirety.

*(3) Plaintiffs Peachlie and Elizabeth Bancroft's Claims for Excessive Force Are Dismissed (Twenty–Third, Twenty–Fourth, Twenty–Ninth and Thirtieth Causes of Action)*

■ Mrs, Peachlie Bancroft and her daughter have asserted constitutional tort claims for the application of excessive force under the Federal and State Constitutions. As discussed above, excessive force claims against non-incarcerated persons are analyzed under the Fourth Amendment to the United States Constitution and Article One, Section 12 of the New York State Constitution.

■ Aside from asserting in conclusory fashion that they were the victims of excessive force, Mrs. Bancroft and her daughter fail to allege any facts that would give rise to an inference that they were subjected to any force at all, let alone

excessive force. The only physical contact between the police and Mrs. Bancroft alleged in the complaint is that Mrs. Bancroft was handcuffed and escorted to the living room; but as noted above, the police were privileged to handcuff Mrs. Bancroft incident to her temporary detention while they searched the premises, and they were privileged to move her into a safe area as well. In her affidavit, submitted in opposition to the motion, Mrs. Bancroft does not identify any physical force that was applied to her whatsoever. No one identifies any physical force that was applied to the child; the most anyone says (in testimony) is that a police officer yelled at the child and told her to shut up. That is rude, but it does not constitute an application of physical force.

For that reason, the Twenty–Third, Twenty–Fourth, Twenty–Ninth and Thirtieth Causes of Action are dismissed on defendants' motion for judgment on the pleadings.

*(4) Leston Bancroft's Claims for Excessive Force (Twenty–Second and Twenty–Eighth Causes of Action) are Dismissed*

The only constitutional tort that give the court the slightest pause are the claims by Leston Bancroft contending that he was the victim of excessive force.

■ The complaint alleges that Leston Bancroft was pushed and shoved and bullied in his apartment, that he was knocked to the floor, which caused him to strike his mouth and face and head on a bathtub, all while he was handcuffed. (Complaint ¶ 16.)

At his Section 50–h hearing, Bancroft testified that he was told to put his hands up, which he did; that he was spun around and handcuffed and sat down; that a police officer ordered him to get up off the bed; that Bancroft hit his own leg and twisted his side (presumably while getting

up off the bed); that the police officer then pushed Bancroft into the bathroom, where he slipped on water that was pooled on the floor and hit his face and left side. The incident in the bathroom occurred while Bancroft was handcuffed.

■ Application of physical force is "excessive" when it is more than is necessary in the circumstances. *Curry v. City of Syracuse,* 316 F.3d 324, 332 (2d Cir. 2003). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (*internal citations omitted*).

Viewing the totality of Bancroft's claim (the complaint and his testimony), the only application of physical force that could conceivably be actionable is the push that propelled him into the bathroom. It has already been held that handcuffing Leston Bancroft was a privileged action, which means it cannot be deemed excessive. *Wright v. Santopietro,* 325 F.Supp.2d 79 (D.Conn.2003). Mr. Bancroft does not allege, as do many similarly situated plaintiffs, that the handcuffs were applied too tightly. Rather, he seeks compensation for the injury he suffered when he fell to the floor.

Bancroft's complaint alleges that plaintiff was "knocked to the floor" of the bathroom. That allegation is what gives the court pause, because it is not clear that it was necessary for the police to knock Mr. Bancroft to the floor in order to prevent violence or the destruction of evidence. For that reason, the court is disinclined to grant defendants' motion for judgment on the pleadings dismissing Mr. Bancroft's excessive force claims.

However, the City has also moved for summary judgment on the ground of qualified immunity on behalf of the unidentified officer defendants. At the outset of a case, this court follows the practice of taking the plaintiff's testimony, assuming it to be true, and determining whether the officers involved in the challenged action are entitled to qualified immunity as a matter of law.

Defendants have provided the testimony of Leston Bancroft concerning the bathroom incident. Significantly, and notwithstanding what is contained in the complaint, Mr. Bancroft did not testify that he was "knocked to the floor." He does not even allege that the force of the push or shove from the officer was so great that it caused him to stagger and fall. Rather, he specifically testified that he fell because he slipped on water on the bathroom floor. To put it in plaintiff's own words, and not the words composed by a lawyer, "He pushed me in the bathroom and I slipped." (Leston 50–h Testimony at 14.)

This sworn testimony casts Mr. Bancroft's excessive force claim in an entirely different light. Plaintiff does not contend that the police put the water on the floor and then pushed him so that he would slip and fall—in fact, he admits that his wife and child likely were the source of the water on the floor. So the fact that there was water on the bathroom floor is irrelevant to the question of whether the police officers applied excessive physical force to the plaintiff. The only relevant question is whether the push that propelled him into the bathroom—the actual physical force used by the officer—was more force than was necessary to move him from the living room into the bathroom. The push resulted in an injury, but only because of an intervening cause—water on the floor. The fact of injury alone does not render the propulsion used by the officer excessive.

On the facts alleged and testified to by Mr. Bancroft, I conclude that no excessive force claim lies. As we all know, "Not

every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865. When Mr. Bancroft was pushed, the police were trying to find a weapon in a place that they (mistakenly but understandably) thought presented danger to them. They thought (mistakenly but understandably) that the people in the apartment were the kind of people who harbored guns, or who harbored people who carried guns, and they were working quickly in order to minimize that danger. I have no doubt that the police were not exhibiting good manners when they moved Mr. Bancroft, but that does not mean that they subjected him to excessive force. And while it is possible that Mr. Bancroft did not need to be pushed in order to get him to move, as long as it was not unreasonable to push him into the room, it does not matter that some less intrusive alternative would have done the job.

 In view of the circumstances as alleged and testified to by the plaintiff, I cannot say that any constitutional violation occurred from the single push alleged by Plaintiff. Furthermore, I cannot say that reasonable police officer would have concluded that it was unnecessary to push the plaintiff into the bathroom. That being so, the officer or officers who pushed Mr. Bancroft into the bathroom would at a minimum be cloaked with qualified immunity against a claim that the single shove was excessive.

Of course, at the present moment the only defendant in this lawsuit is the City of Mount Vernon. The individual police officers have not been identified, let alone sued. Nonetheless, the City has moved on behalf of the unknown police officers, asking for summary judgment on their behalf. It is not at all clear that Mt. Vernon's motion on behalf of the John Doe officers is procedurally proper, although I note that the City followed exactly the same procedure in the *Lynch* case. Ideally, the officers would have been identified and joined, and would have moved on their own behalf.

However, it makes little sense to require the City of Mt. Vernon to identify the police officers involved, and to subject those officers to service of process and the ignominy of being sued, if it is clear from the facts pleaded that Mr. Bancroft's excessive force claim against them will have to be dismissed. Put otherwise, it would be futile to allow plaintiff to amend the complaint to name the officers who were involved, because there is no way he can prevail on his excessive force claim against them.

*(5) Because All Constitutional Claims Have Been Dismissed the Section 1983 Claim Against the John Doe Officers for Failure to Intervene Must Also Be Dismissed (Twenty–Fifth, Twenty–Sixth and Twenty–Seventh Causes of Action)*

 Officers who are present when constitutional torts are being committed have a duty to intervene and stop the unconstitutional conduct if they have a reasonable opportunity to do so. *Curley v. Village of Suffern*, 268 F.3d 65, 72 (2d Cir.2001); *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir.1988). All three plaintiffs allege failure to intervene claims against the John Doe police officers. However, those claims necessarily fail because all the constitutional tort claims have been dismissed. *Curley*, 268 F.3d at 72.

*(6) Plaintiffs' Sixteenth, Seventeenth and Eighteenth Causes of Action are Dismissed*

In their Sixteenth, Seventeenth and Eighteenth Causes of Action, plaintiffs assert that their "Civil Rights under the First, Fourth, Fifth, Eighth and Four-

teenth Amendments of the United States Constitution" were violated by the collective action of the police officers who searched their apartment. Plaintiffs bring this claim under Sections 1981, 1983, 1985, 1986 and 1988 of Title 42 of the United States Code.

These claims are dismissed for the following reasons:

 First, to the extent that the facts alleged by plaintiffs in their complaint, their testimony, and their affidavits assert any federal constitutional tort at all, they make out claims for unreasonable search and for false arrest/false imprisonment during the period of time while the officers were in the apartment. Both unreasonable search and false arrest/imprisonment (unreasonable seizure) are violations of the Fourth Amendment, made applicable to the states by the Fourteenth Amendment. So is the use of excessive force by a police officer on a non-incarcerated person. *Graham*, 490 U.S. at 388, 109 S.Ct. 1865.

 Plaintiffs allege no facts that, if proved, would make out any violation of their First, Fifth or Eighth Amendment rights. The First Amendment addresses freedom of speech, petition and assembly; none of those are implicated here. The Fifth Amendment addresses the requirement that no individual be deprived of life or liberty without due process of law; Plaintiffs were not accused of any crime or incarcerated, so that Amendment has nothing to do with this case. And the Eighth Amendment is addressed exclusively to the treatment of persons incarcerated in penal institutions. *Ingraham v. Wright,* 430 U.S. 651, 671 n. 40, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977).

Therefore, these three claims must be dismissed to the extent that they claim violations of the First, Fifth or Eighth Amendments.

Second, insofar as they assert a Fourth/Fourteenth Amendment violation based on unreasonable search and seizure or use of excessive force, the Sixteenth, Seventeenth and Eighteenth Causes of Action are duplicative of the causes of action that assert the underlying federal constitutional torts of unreasonable search and seizure (Nineteenth, Twentieth and Twenty–First Causes of Action) and excessive force (Twenty–Second through Twenty–Fourth Causes of Action). To the extent of that duplication, the Sixteenth, Seventeenth and Eighteenth Causes of Action must be dismissed.

 It became clear, from plaintiff's response to the motion for judgment on the pleadings, that Peachlie Bancroft asserts a claim for violation of her right to privacy under the Fourteenth Amendment. The action that allegedly violated her right to privacy was the officers' refusal to allow her to "cover her nakedness" (to use the old biblical phrase) for the first three or four minutes that they were in her bedroom. This claim cannot be dismissed as duplicative of other claims asserted in the complaint.

However, defendants are entitled to judgment on the pleadings dismissing this claim. Peachlie Bancroft was in bed when the officers entered her home. She was ordered not to move while they conducted a protective sweep of the area, for their own safety and the safety of others. It is unfortunate that Mrs. Bancroft was not wearing nightclothes and regrettable that she was unable to pull the sheet up to cover her naked chest. However, the United States Supreme Court has held that officers do not violate privacy rights when, in the course of executing a warrant, they refuse to allow unclothed persons to cover themselves while they sweep and secure a room. *Los Angeles County v. Rettele, et al.,* 550 U.S. 609, 615–16, 127

S.Ct. 1989, 167 L.Ed.2d 974 (2007) (per curiam). Mrs. Bancroft does not allege any facts tending to suggest that the officers took longer than necessary to protect their safety before by her own admission, the officers told her they did not want to look at her body and they brought her clothes and allowed her to dress before they handcuffed her. (Peachlie Aff. ¶¶ 5, 7–8.) Therefore, Peachlie Bancroft's bare Fourteenth Amendment claim is dismissed.

As has been seen, plaintiffs fail to state any claim under 42 U.S.C. § 1983 for any violation of their federal constitutional rights. It necessarily follows that to the extent that the Sixteenth, Seventeenth and Eighteenth Causes of Action assert claims for conspiracy to violate their constitutional rights under 42 U.S.C. § 1985, those claims, too, must be dismissed.

Finally, the Sixteenth, Seventeenth and Eighteenth Causes of Action purport to sue under 42 U.S.C. § 1981, which provides:

(a) Statement of equal rights

■ All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

The facts alleged in the complaint do not admit of the slightest inference that anything that happened to the Bancrofts impaired their equality of rights with white citizens. The fact that they are African American and that something bad happened to them does not mean that the bad thing happened because they are African American. That is all plaintiffs allege. Their claim fails.

*(7) The Monell Claim Against The City of Mount Vernon Must Be Dismissed*

The dismissal of the federal constitutional claims against any officer responsible means that the corresponding federal claim against the City of Mount Vernon and its Police Department must be dismissed. The claims against the MVPD itself are dismissed because the Department, as an agency of the City, is not a suable entity. And since there was no violation of the plaintiffs' constitutional rights, the City has incurred no liability under the rule of *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). *See City of Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986).

*(8) Plaintiffs' State Law Claims Are Barred by Governmental Immunity*

All three plaintiffs have asserted identical common law tort claims for gross negligence, negligence, intentional infliction of emotional distress, assault, battery, and false arrest/false imprisonment. Those claims are barred by the doctrine of governmental immunity.

■ Under New York law, governmental officers are immune from tort liability based on "official action involving the exercise of discretion even if resulting from negligence or malice." *Lynch v. City of Mount Vernon,* 567 F.Supp.2d, at 470 (*citing Tango by Tango v. Tulevech,* 61 N.Y.2d 34, 40, 471 N.Y.S.2d 73, 459 N.E.2d 182 (1983) (ellipses and alterations removed)). Municipalities are immune from liability based on the discretionary acts of their employees—including police officers—provided the actions of the officers were not inconsistent with acceptable police practice. *McCormack v. City of New York,* 80 N.Y.2d 808, 811, 587 N.Y.S.2d

580, 600 N.E.2d 211 (1992); *Arias v. City of New York,* 22 A.D.3d 436, 802 N.Y.S.2d 209 (2d Dept.2005). No fact alleged in the complaint even remotely suggests that the officer defendants acted in a manner that was inconsistent with acceptable police practice; indeed, the numerous cases cited above make it quite clear that the practices the officers followed in this case—obtaining a warrant, executing a no-knock search, temporarily detaining the occupants of the apartment (handcuffing the adults) while the search was carried out—are completely consistent with the types of practices that have been found constitutional in other cases. Because the unnamed officer defendants are immune from suit, there is no basis to hold the City of Mount Vernon liable for their conduct under the doctrine of *respondeat superior.*

Nor can the City of Mount Vernon be held liable to the plaintiffs in negligence. In New York, municipalities cannot be sued directly for common law negligence unless it can be shown the municipality owed a specific duty to the plaintiffs. *See Lauer v. City of New York,* 95 N.Y.2d 95, 100–101, 711 N.Y.S.2d 112, 733 N.E.2d 184 (2000). This duty must be more than that owed to the public generally. *Id.* In this case, the City owed no special duty to the plaintiffs, above and beyond what it owed to the public at large.

## Conclusion

Like Judge Conner in the *Lynch* case, I deeply sympathize with plaintiffs, who have been subjected to a frightening intrusion in their lives. But I, like Judge Conner, must also be sensitive to the public necessity of enforcing the law and protecting those who are charged with that awesome responsibility. Unfortunately, not every wrong can be remedied in a court of law.

For the foregoing reasons, the complaint is dismissed, with prejudice and without costs. The Clerk of the Court is directed to close the file.